1813.

*Philadelphia,*
*Monday,*
July 12.

LYLE *against* DUCOMB.

THIS cause was argued under a case, which stated as follows:

" *Vincent Ducomb*, the defendant, executed to *James Lyle*, the plaintiff, on the 21st of *February* 1811, a bond and warrant of attorney in the penal sum of 18000 dollars, conditioned for the payment of 9000 dollars on demand; and accompanied the same with a mortgage of the same date, on a house in *Walnut* street near *Second* street, on the back of which was indorsed an agreement, that the said mortgage was to secure *James Lyle* and *Lyle* and *Newman*, from loss, by sundry promissory notes already drawn by *Lyle* and *Newman*, and others *about to be drawn* by *James Lyle*, in favour, and for the use of *Ducomb*, to the amount of 9000 dollars; that *Lyle* should have these notes renewed for twelve months, and *Ducomb* should take them up; but if at any time *Lyle* was under the necessity of paying any of them, he was to be at liberty to proceed immediately on the bond and mortgage, and from the proceeds of sale, to pay all the notes, and the overplus to go to *Ducomb*. By another memorandum indorsed upon the mortgage on the 5th of *September* 1811, it was agreed at the instance of *Ducomb*, and for his convenience, that instead of *Lyle* or *Lyle* and *Newman* being the drawers of all the notes, some of them might be drawn by *Ducomb*, and indorsed by the other parties, and that the mortgage should be a security, not only for the notes drawn, but for the notes endorsed.

" On the 22d of the same month of *February*, the said mortgage was acknowledged, and on the 28th of *February* was recorded. *James Lyle*, and *Lyle* and *Newman*, afterwards lent their notes and indorsements to *Vincent Ducomb*, to the amount of 9000 dollars, relying on the said mortgage as their security, and, in pursuance of the said agreement, continued to renew the same, until *December* 1811, when *Ducomb* became insolvent, and *James Lyle* and *Lyle* and *Newman* took up all the said notes, and after deducting all the money recovered from the rest of the property of the said *Ducomb* sold by the sheriff by execution, and other funds in their hands, there remains a balance of 3378 dollars 49 cents due to them; but none of the said notes were paid

*The mortgagee of a lot of ground, has a lien, not only on the ground, but on the buildings erected subsequent to the mortgage, in preference to brickmakers and other material men who claim under the lien law of 1806.*

*A mortgage given to indemnify the mortgagee against loss in consequence of his drawing notes in favour of the mortgagor, is as valid where the notes are to be drawn in futuro, as where they are already drawn; and if the parties by indorsement on the mortgage agree, that instead of drawing notes for the whole amount, the mortgagee shall indorse part, for which the mortgage shall be a security, the mortgagee will have a lien for the indorsements, not only against the mortgagor, but also against the material men, who subsequently erect buildings on the ground.*

1813.

LYLE
v.
DUCOMB.

until after the month of *November* 1811, so that in fact no money was paid or advanced by *James Lyle* for or on account of said mortgage, until after *November* aforesaid.

"That when the said mortgage was so given by the said *Vincent Ducomb*, there was a frame house on the lot mortgaged, which *Ducomb* afterwards pulled down, and caused to be erected on the said lot a brick house; but he did not pay the mechanics and workmen for the materials and labour found and furnished for the buildings, which mechanics and workmen now claim a lien on said brick house and lot, in preference to the said mortgage, and the judgment which has been entered on the said bond. The materials were all furnished, and the building was nearly completed, before *December* 1811, and before the payment of any money by *Lyle*, or *Lyle* and *Newman*, on account of the said notes or indorsements.

"If the Court should be of opinion that the proceeds of sale in the sheriff's hands should be paid to *James Lyle*, towards satisfaction of his bond and mortgage, then the said *James Lyle* is intitled to receive the whole sum so in the sheriff's hands.

"But if the Court should be of opinion, that the persons who claim liens, are intitled to a preference out of the proceeds of the building only, in that case the Court to appoint three men to ascertain what proportion of the proceeds of sale shall be considered as the value of the building, and what proportion thereof shall be considered as the value of the lot, and also to ascertain the amount respectively due to each of the lien creditors, who may have filed their claims and proceeded according to law.

"And if the Court shall be of opinion, that the said *James Lyle* is not intitled to any preference, either in the proceeds of the house or lot, then the said *James* to receive only the surplus of the proceeds of sales, after satisfying such of the said lien creditors, as have filed their claims according to law."

The main question depended on the first section of the act of the 17th of *March* 1806, which enacts "that all and "every dwelling house, or other building, hereafter con- "structed and erected within the city and county of *Phila-* "*delphia*, shall be subject to the payment of the debts con- "tracted for or by reason of any work done or materials "found and provided by any brickmaker, &c. or any other

" person or persons employed in furnishing materials for,
" or in the erecting and constructing such house or other
" building, *before any other lien, which originated subsequent*
" *to the commencement of the said house or other building;*
" but if such house or other building should not sell for a
" sum of money sufficient to pay all the demands for work
" and materials, then and in such case the same shall be
" averaged, and each of the creditors paid a sum propor-
" tioned to their several demands." 4 *Smith's Laws* 300.

*Tod* for the plaintiff.

*Delany* and *Hopkinson* for the lien creditors.

TILGHMAN C. J. The plaintiff had a mortgage on a lot
of ground, the property of the defendant, on which was
erected a wooden house. The mortgage was regularly ac-
knowledged and recorded, after which the defendant pulled
down the wooden building, and erected a brick one. The
different mechanics who furnished the materials, and did the
work of the brick building, claim a lien on it in preference
to the plaintiff's mortgage, by virtue of the act of the 11th
of *March* 1806. By that act it is enacted, that " all buildings
" thereafter erected within the city and county of *Philadel-*
" *phia,* shall be subject to the payment of the debts contract-
" ed for or by reason of any work done or materials found
" and provided by any brickmaker, bricklayer &c. &c. *before*
" *any other lien which originated subsequent to the commence-*
" *ment of the said building.*" At the first reading of this clause,
it seems a very plain provision, that the lien of the workmen
&c. shall be preferred to mortgages, judgments &c. given
by or obtained against the proprietor of the house, after the
commencement of the building. But by an argument which
appears to me too refined, it is contended that mortgages
&c. *prior* to the commencement of the building, may be said
according to the intent of this act, to originate subsequent
to the commencement of the building, so far as respects
their lien on the building; and the argument is simply this,
that it is impossible to have a lien on a thing not in exist-
ence, and therefore a mortgage cannot be a lien on a building
before it is erected. In answer to this, it is to be considered
that a mortgage is a legal conveyance of the land itself, and
of course the mortgagee has the legal title as long as the
mortgage is in force, to the land and every building erected

on the land. It may be asked, and I see not how the question can be answered, at what moment the mortgage began to be a lien on the building, in the sense contended for by the defendant. Was it when the building commenced, or during the time that it was carrying on, or not until it was finished? The idea of separating the building from the ground on which it stands, is altogether novel, and cannot be carried into practice without great difficulty. It is confessed that the land itself remains to the mortgagee, and of course that he may proceed to sell it under the mortgage. But the land cannot be sold without the house. In order to remove this difficulty, it is said that both land and house shall be sold, and the value of each ascertained by arbitrators appointed by the Court. I know not whence the Court derive this power. There is not a word of it in the act of assembly. Thus the obvious meaning of the expressions of the law are rejected, in order to introduce difficulties, which cannot be removed without the assumption of powers, which, to say the least of them, are very doubtful. Besides, this construction may do manifest injustice to the mortgagee, as it does in the case before us. At the time of the mortgage there was a wooden house; this has been pulled down, and the mortgagee has lost the benefit of it. It would be the same if the first building had been of brick instead of wood. In the rapid improvement of this city, we are every day pulling down old brick buildings, and putting up new ones in their place. In such cases then the mortgagee who had the security of a good house and land, is to rest contented with the land alone; and he is to trust to the decision of arbitrators to fix the value even of that; and all these difficulties and inconveniences are to be resorted to, in order to protect persons, who certainly have been unfortunate, but who have no right to complain, because they undertook the building with full notice of the mortgage. It is far better to follow the plain meaning of the words used in the act, which involves us in no difficulties, and protects all persons who make use of due diligence in searching for liens which existed before the commencement of the building. I will add that the legislalature, by mentioning *subsequent* liens, must have supposed that there might have been prior liens which were to keep their preference. But if a mortgage bearing date before the commencement of the building was not prior, it is not easily

to be conceived what could be prior. In fact, the defendant's argument proves too much, for, if it proves any thing, it must prove, that it was impossible there should be any lien prior to the commencement of the building. I have said more on this subject than I should have thought necessary, had it not been mentioned by the defendant's counsel, that the construction for which they contend had been sanctioned by the decision of the Courts of Common Pleas, and District Court of this city. We have no report of the cases; perhaps they may have been attended with particular circumstances.

But there is another question in this cause. Supposing the plaintiff's mortgage to have the preference, shall it be preferred to the amount of his whole demand? The mortgage appears by an indorsement on it, to have been intended as a security to the plaintiff, for notes *drawn* or *to be drawn* by the plaintiff and by *Lyle* and *Newman*, in favour of the defendant, and for his use and accommodation, to the amount of 9000 dollars. These notes were to be renewed from time to time by the plaintiff for twelve months, when they were to be taken up by the defendant with his own funds. By another indorsement on the mortgage, subsequent to the commencement of the brick building, it was agreed between plaintiff and defendant, at the request of the defendant and for his convenience, that instead of *Lyle* or *Lyle* and *Newman* being the *drawers* of *all* the notes, some of them might be *drawn* by the defendant and *indorsed* by the plaintiff or by *Lyle* and *Newman*, but the whole amount was still limited to 9000 dollars. It is said that this was a departure from the original agreement, and therefore the mortgage lost its force as to all the *indorsed* notes. I cannot think so. The parties to the mortgage had a right to alter the agreement as they pleased, and so far as *they* were concerned, there cannot be a particle of doubt. With respect to third persons, the mortgage could not be altered to their prejudice; but I do not consider this as an alteration to their prejudice. It is perfectly immaterial to them, whether notes to the amount of 9000 dollars were *drawn* or *indorsed* by *James Lyle* and *Lyle* and *Newman*. The object was to raise 9000 dollars for the defendant on their credit, and this sum would have been raised by *drawing*, if it had not been done by *indorsing*. The drawing or indorsing was but the form; the raising of 9000 dollars, and an indemnity to that amount

1813.

LYLE
v.
DUCOMB.

by mortgage, the substance. I am of opinion that the parties had a right to vary this form, without impairing the force of the mortgage, either as it regarded themselves or others. It was opened by the defendant's counsel, though not much insisted on, that a mortgage intended as an indemnity against acts *to be performed at a subsequent time*, ought not to have any effect against third persons. This point was very properly abandoned. There cannot be a more fair, *bona fide*, and valuable consideration, than the drawing or indorsing of notes at a future period, for the benefit and at the request of the mortgagor; and nothing is more reasonable than the providing a sufficient indemnity beforehand. On all the points which have been made in this case, my opinion is in favour of the plaintiff.

YEATES J. I have not a particle of doubt as to the mortgage executed by the defendant to the plaintiff on the 21st of *February* 1811, duly acknowledged and entered upon record on the 28th of the same month, that it operated as an incumbrance on the lot of ground, and frame house thereon from the time of its *execution*, according to the true intent and meaning of the parties at that period, although no money was actually paid until after the month of *November* following. It took effect by way of indemnity, and notes were furnished to the mortgagor, upon a reliance on its security. I have known several instances of mortgages given to indemnify sureties, and never heard their legal operation questioned before on this score.

The equity of redemption on the face of the mortgage, rests on the payment of 9000 dollars on demand to *Lyle*. But by an indorsement thereon signed by all the parties, and bearing equal date therewith, it is stated " that the " bond and mortgage recited therein had been given to se- " cure *Lyle* and *Newman* and *James Lyle* against any in- " convenience or damage he or they might sustain, by rea- " son of divers promissory notes already drawn by the said " *Lyle* and *Newman*, and of other notes about to be drawn " by *James Lyle* in favour of *Ducomb*, to the amount of " 9000 dollars, all of which notes have been or are about to " be drawn for the use and accommodation of, and lent to " *Ducomb*, and which notes *Lyle* thereby promised to renew " from time to time as they might become due, and so to

" continue to renew the same for the space of twelve ca-
" lendar months from that time, besides the days of grace."
It was further stipulated, that _Lyle_ should not at any time
be called upon by _Ducomb_, to furnish cash to take up or pay
all or any part of the said notes, but that the same should be
paid and taken up by _Ducomb._

By another indorsement on the mortgage likewise signed
by all the parties, bearing date the 5th of _September_ 1811, it
is recited that " whereas it appeared by the declaration of
" _Ducomb_, that in some cases it would be most convenient
" for him to have the indorsements of _Lyle_ and _Newman_ and
" of _James Lyle_ on notes drawn by _Ducomb_, instead of notes
" to be drawn by them or either of them, as was mentioned
" in the first agreement, and _Lyle_ and _Newman_ and _James_
" _Lyle_ were willing so to accommodate _Ducomb_: It was
" agreed, that the bond within recited, and the within mort-
" gage, should be held not only to indemnify _James Lyle_
" and _Lyle_ and _Newman_ from such notes of which they
" might be drawers as before mentioned, but also in like
" manner to indemnify them against any inconvenience or
" damage they or either of them might sustain by reason of
" any indorsements lent or to be lent as abovementioned;
" and that the said _Lyle_ and _Newman_ and _James Lyle_
" might have the same advantages and benefits for the reco-
" very of any money they might be compelled to pay as in-
" dorsers, as by the first agreement they might be compelled
" to pay as drawers of notes; and that generally the above
" agreement and every thing therein contained, should ex-
" tend to such indorsements as they might give, in as full
" and ample manner as if they had been notes drawn by
" them or either of them."

I have been minute in my extracts from these two agree-
ments. I shall hereafter more particularly consider the light
in which I view their influence upon the questions before the
Court.

In opposition to the claim of the mortgagee to take out of
Court the money raised by the sheriff, it has been contended
that the mortgage having been given subsequent to the 17th
of _March_ 1806, when a law was enacted conferring a lien
on dwelling houses and other buildings thereafter to be

1813.

LYLE
v.
DUCOMB.

erected within the city and county of *Philadelphia*, in favour of workmen and material men, must be considered as controlled thereby, as to its general legal operation; that the mortgagee relied for his indemnity on the vacant lot and frame house thereon, and that he ought not to receive the superadded value of the property by the new brick building, inasmuch as he would thereby materially affect the interests of other persons, and violate the spirit of the law. It was admitted that the lien of the mortgage, if it operated as an incumbrance under all the circumstances of the case, extended to the ground covered by the new erection; and therefore it had been mutually agreed, that if the Court should be of opinion, that the persons who claimed liens, were intitled to a preference out of the proceeds of the building, persons were to be appointed to ascertain what proportion of the proceeds of sale should be considered as the value of the building, and what proportion thereof should be considered as the value of the lot. Decisions of the District Court, and of the Court of Common Pleas of this county, were referred to during the argument, from whence it was said the principles insisted upon might fairly be inferred, but we were not furnished either with the particulars of the cases, or the grounds of decision. I am compelled to acknowledge that the observations of the counsel made a considerable impression on my mind during the argument, but more mature reflection since has effaced them.

We are now called upon to construe this law upon general principles, and to declare what effect it ought to have. It makes no distinction between the operation of liens prior or posterior to the passing of the act; and yet it is certain, that if the doctrine contended for is applied to incumbrances done or suffered previous to the 17th of *March* 1806, it would impair the obligation of a preceding contract. Erections made on lands which have been mortgaged, operate as a further security to the mortgagee, for *cujus est solum, ejus est usque ad cœlum.* It cannot be asserted with any shadow of reason, that a mortgagee shall be placed at the mercy of a mortgagor; that the latter may prostrate what erections are on the ground, and build up others at his sole will and pleasure, which might diminish the security of the former upon a sheriff's sale, if they are to be paid for out of the proceeds of the sheriff's sale. The mortgagor might thus cover the

whole of a vacant city lot with expensive buildings, and if the mortgagee is eventually compelled to buy it in for his own security, he would be subjected to pay monies out of his own pocket according to the ideal value of those buildings in the estimation of others. Many inconveniences would flow from the principles which have been insisted upon. The law confers on us no power to appoint persons to ascertain the proportional value of the buildings as to the lot, against the will of the mortgagee. It is much better therefore, to adhere to the words of the act of the 17th of *March* 1806, which are susceptible of a plain and obvious meaning. " All " and every dwelling house or other building hereafter con- " structed and erected within the city and county of *Philadel-* " *phia*, shall be subject to the payment of the debts contract- " ed for or by reason of any work done or materials found " and provided by any brickmaker &c., before any other lien, " which originated *subsequent* to the commencement of the " said house or other building." The mortgage here preceded the building, and must prevail against the claims of the artisans and materialists according to its legal operation, and, the true intent and meaning of the parties at the time of its execution, as I have mentioned before. The purposes of the mortgage must be first answered, before the other claimants can be let in. This leads me to inquire into the legitimate extent of the mortgage, as far as it affects those claimants, in which I am so unfortunate as to differ in opinion from my brothers. I will give the reasons of my dissent.

I regard the indenture of mortgage, and the indorsement on it bearing equal date therewith, as one act, in the same manner as if they had been incorporated in the same instrument. They show the intention of the parties accurately and precisely defined at the moment. The mortgage was expressly declared to be an indemnity against divers promissory notes drawn by *Lyle* and *Newman*, and of other notes about to be drawn by *James Lyle* in favour of *Ducomb*, to the amount of 9000 dollars. To the amount of the notes thus drawn and taken up by them, the mortgage takes effect from the date of the 21st of *February* 1811, but no further as between the litigant parties. Above six months after, viz. the 5th of *September* 1811, a new agreement was entered into, whereby it was declared, that the indemnity of the mortgage should extend to indorsed notes in order to meet

the wishes of *Ducomb*, and to suit his convenience. If it is possible to doubt what was intended by the first agreement, these doubts would be removed by the inspection of the second indorsement; wherein it is declared that the mortgage should be held, not only to indemnify *James Lyle* and *Lyle* and *Newman* against such notes of which they might be drawers, but also against their indorsements of notes drawn by *Ducomb* himself. Previously thereto, the building of the house commenced, and the liens of the workmen and materialists attached under the law, subject however to the priority of the mortgage, according to its legal effect and the contract of the parties. If the terms were changed by the second contract, as I think clearly they were, for the reasons I have given, was it competent to the parties to make this alteration to the injury of intervening creditors by a statutable lien? This then is the question.

It has been urged on the part of the mortgagee, that the spirit of the contract was an indemnity against notes lent or indorsed for the accommodation of *Ducomb;* and that third persons have no right to object that the notes were indorsed by *James Lyle* or *Lyle* and *Newman*, instead of being drawn by them or either of them. The same substantial benefit was conferred on *Ducomb* in either mode.

True: as between the original parties, the whole transaction is perfectly right and fair. But how far it should affect third persons, now becomes the point of inquiry. That the mortgage was meant as an indemnity, there can be no question; but it must be limited and governed by the agreement of the parties. To warrant a recovery upon it, there must have been a damnification within the precise terms of the contract. If those original terms have been enlarged to the injury of other lien creditors, those creditors have a right to make objections. I will exemplify my system of reasoning by putting a few instances. It would be of no moment to a mortgagor, whether the consideration money of the mortgage was grounded on the delivery to him of *meal* or of *malt*, or of his individual debts due to other persons for such articles advanced and paid by the mortgagee. But if a mortgage is given to indemnify a person against an advancement of money for debts due for *meal*, it will not be construed an indemnity to the mortgagee for monies paid by him for debts due for *malt*. So in the principal case, if *James Lyle* or *Lyle*

and *Newman* had purchased in the notes of *Ducomb*, or had given him bonds instead of notes, I should hold the mortgage could not take effect as an indemnity in such cases to the injury of other lien creditors, so as to squeeze them out. The present is a struggle between two classes of creditors, whom I will suppose to be equally meritorious; their several legal rights should prevail.

Upon the whole matter I am of opinion, that the plaintiff is intitled to a preference as to receiving the proceeds of sales to the amount of the notes drawn by himself or by *Lyle* and *Newman*, and taken up by them in pursuance of the mortgage, but no further.

BRACKENRIDGE J. concurred with the Chief Justice.

Judgment that the money be paid to the plaintiff.