## CALKINS and others *against* LOCKWOOD and others.

*A*, being the owner of a furnace for the manufacture of iron, leased it, in *November*, 1840, to *B*; and in *January*, 1842, while *B* was thus the lessee of *A*, a written agreement was entered into between them, by which *A* stipulated to become the surety of *B* for the coal, which *B* had purchased, or might purchase, to carry on the manufacture of iron; and *B*, for the purpose of securing *A* for such suretyship, assigned to *A* the stock, iron and other personal property in and about the furnace, and agreed, that the coal thereafter to be delivered, should be delivered as the property of *A*, and that *A* should have a lien on all the iron made, or to be made, at the furnace, and on all the stock and personal property that *B* might have in and about the furnace, until such coal should be paid for, and *A* indemnified; *A* to have a right, at all times, to controul and direct the sale of the iron, and apply the avails to his liabilities, and account for the balance. *B*, in the prosecution of his business, afterwards purchased coal of *C*, the payment for which was guarantied by *A*. In *February*, 1843, *B* became insolvent and absconded; and *A*, for the purpose of securing himself, went to the furnace, and finding there a quantity of iron, which *B* had manufactured subsequently to his contract with *A*, took possession of such iron, by virtue of such contract, and removed it a short distance, and, the next day, sold it to *C*, in payment of *B's* indebtedness to him for coal. During this period, the existence of the contract was not publicly known, and *B* carried on a large business in the manufacture of iron, which he disposed of at his pleasure, without any interference on the part of *A*. After the seizure of the iron by *A*, and before the sale thereof to *C*, it was attached, by *D* and others, to whom *B* was indebted for coal. In an action brought by *C* against such attaching creditors, it was held, 1. that the contract between *A* and *B* was not, as between themselves, void or inoperative, as to this iron, because the iron was not in existence when the contract was made, or for any other reason; 2. that the contract was equally valid, as

against such attaching creditors; it not being void, because it related to liabilities thereafter to be assumed, and to property thereafter to be manufactured; or because it was not accompanied by possession; or because it was an attempt to cover the property of *B;* or because it was, under all the circumstances of the case, constructively fraudulent. [One judge dissenting.]

*Litchfield,*
June, 1844.

Calkins
*v.*
Lockwood.

THIS was an action of trover for a quantity of pig iron.

The defendants pleaded the general issue, with notice of special matter to be given in evidence as a justification.

The cause was tried, at *Litchfield, April* adjourned term, 1844, before *Waite,* J.

The parties respectively claimed title to the iron in question, under *Nathaniel E. Bradley,* the manufacturer thereof, and the undisputed owner until the 16th of *February,* 1843; when, as the plaintiffs claimed, it was taken possession of, by *Barnabas Payne,* by virtue of the following contract between him and *Bradley :* "This agreement between *Nathaniel E. Bradley,* of the one part, and *Barnabas Payne,* of the other part, *witnesseth,* That whereas said *Bradley* is operating the furnace in *Sharon,* as the lessee of said *Payne ;* and said *Payne* has become surety for said *Bradley,* for the payment of certain lots of coal, *viz.* one lot of coal, which said *Bradley* purchased of *Jeremiah Calkins,* last season, on which contract about 14,000 bushels, at six dollars, fifty cents, *per* hundred, were delivered to said *Bradley ;* and one other lot of coal, which said *Bradley* purchased of *Garry S. Moses,* last season, on which contract about 12,000 bushels, at the same price, were delivered to said *Bradley ;* and whereas said *Bradley* is about to enter into a contract with *Henry Bird* and *Charles Kilmer,* for the purchase of from 30,000 to 50,000 bushels of coal, to be delivered to said *Bradley,* at the furnace in said *Sharon,* in the course of next season or summer, at the price of six dollars, seventy-five cents, *per* hundred bushels; and whereas said *Bradley* cannot conveniently procure said contemplated contract to be executed by said *Bird* and *Kilmer,* unless said *Payne* will warrant or guaranty the performance of the same, on the part of said *Bradley ;* and whereas said *Payne* undertakes to warrant the performance of said contract, and has, this 4th day of *January,* 1842, warranted the performance of the same, on his said *Bradley's* part, in writing : Now, be it known, that said *Nathaniel E. Bradley* obligates and binds himself and his heirs to indem-

nify and save harmless him the said *Payne,* from all loss and damage, on account of his having warranted said contract, and become surety as aforesaid.

"And said *Bradley,* with a view to secure said *Payne,* for having warranted said contracts, and become surety for him as aforesaid, hereby sells and assigns to him such stock, iron and personal property, as there is now lying about and in said furnace. And it is agreed, that the coal hereafter to be delivered, shall be delivered as the property of said *Payne,* and that he shall have a lien on any and all the iron, which shall be made at said furnace, and all the stock and personal property that said *Bradley* may have in and about said furnace, from the present time till said coal shall be paid for, and said *Payne* shall be discharged and released from his said guaranties and undertakings in behalf of said *Bradley.* And said *Payne* may controul and direct the sale of such iron, and receive the notes or money therefor, until he shall raise a sufficient sum to meet all the liabilities he has, or may hereafter, assume on behalf of said *Bradley;* and may, at any time, sell and dispose of stock, and such personal property, to raise funds to meet such liabilities.

"And it is agreed, on the part of said *Payne,* that if he shall, at any time, dispose of any more property than the amount of said liabilities, he will account to said *Bradley* for the balance. It is also agreed, that said *Payne* shall not sell or dispose of property faster than may be necessary to raise funds to pay said liabilities, from time to time, as they shall fall due and payable; but his lien and right to controul said property shall continue and exist, at all times, till he shall be completely discharged from said contracts.

"And it is agreed, that for a more accurate and full description of said contracts, which are warranted by said *Payne,* if necessary, reference may be had to the same, or copies thereof. Dated at *Salisbury,* this 4th day of *January,* 1842.

*Nathaniel E. Bradley.*

*Barnabas Payne.*"

The defendants claimed title to the iron, by virtue of several writs of attachment against *Bradley,* levied upon it, by the defendant, *Lockwood,* as a deputy-sheriff, on the 16th and 17th days of *February,* 1843, in favour of the other defendants in this suit, and other creditors of *Bradley.*

The plaintiffs, in support of their title, read in evidence this contract, and also the following documents.  1. A lease of the furnace, dwelling-house and store, with certain water privileges, and about six acres of land, in *Sharon Valley*, from *Payne* to *Bradley*, dated *November* 27th, 1840, to commence on the 1st of *April*, 1841, and to end the 1st of *April*, 1844. 2. An agreement between *Payne* and *Bradley*, in relation to additional rent, dated *April* 17th, 1841.  3. A further agreement between the same parties, in relation to rent, dated *January* 17th, 1843.  4. A contract between *Bird* and *Kilmer*, two of the plaintiffs, and *Bradley*, with *Payne's* guaranty thereon, dated *January* 4th, 1842.  5. A receipt from *Bird* and *Kilmer* to *Bradley*, dated *January* 10th, 1843.  6. A contract between *Calkins*, the other plaintiff, and *Bradley*, with *Payne's* guaranty thereon, dated *February* 24th, 1842.  7. A receipt from *Calkins* to *Bradley*, dated *June* 3d, 1843.   The due execution of these instruments was not denied by the defendants.

The plaintiffs also produced evidence to prove, that on the 16th of *February*, 1843, there was due from *Bradley* to *Payne*, on said lease, 738 dollars ; to *Bird* and *Kilmer*, 1633 dollars, 34 cents, as stated in their contract and receipt ; and to *Calkins* 750 dollars, on his contract ; that for the last two sums, *Payne* was liable upon his guaranties ; that for the purpose of securing himself, *Payne* went to the furnace by him leased to *Bradley*, where he found two parcels of pig-iron, one containing about seventy-five tons, the iron in controversy, and the other about ten tons, and immediately took possession of the whole of such iron under said contract, and caused it to be removed a short distance, and the next day sold the whole of it to the plaintiffs, in part payment of their debts, *Bird* and *Kilmer* being the purchasers of one undivided half, and *Calkins* the purchaser of the other.

The plaintiffs further offered evidence to prove, that they, having learned that *Lockwood*, as deputy-sheriff, had attached a large parcel of iron, upon writs in favour of the other defendants, afterwards, on the 17th of *February*, 1843, demanded of him possession of the iron, and afterwards, and before the commencement of this suit, made a like demand of the other defendants ; and that they all refused to deliver possession of the iron.

*Litchfield,*
June, 1844.

Calkins
*v.*
Lockwood.

The defendants did not deny any of these facts, except the removal of the iron by *Payne,* which, they claimed, was done by *Lockwood,* by virtue of his attachments. And for the purpose of avoiding future litigation, they waived all objection to the plaintiffs' right to recover, provided the court should be of opinion, that *Payne* could recover of them for the iron in question, which, they admitted, was still in their possession. But they claimed, that said contract was fraudulent, both in fact, and in law, and gave *Payne* no lien upon the iron, nor any authority to seize and hold it, against the attaching creditors of *Bradley.* In support of their claim, they introduced evidence to prove, that the iron was not in existence, when the contract was made, but was manufactured by *Bradley,* a long time subsequent thereto ; that *Payne* entirely concealed from the public all knowledge of the existence of such contract, until the time of his seizure of the iron ; that during all that time, he permitted *Bradley* to hold himself out to the world, as the absolute owner of all the personal property of the furnace, and the iron there made ; to carry on there a large and extensive business, in the manufacture of iron ; to employ workmen, and purchase other articles, upon credit ; and to sell and dispose of the iron he made, at his pleasure, without any interference on the part of *Payne,* or any claim made by him, to any of the property, by means of which the workmen and others, who dealt with *Bradley,* in the way of his business, were deceived and defrauded, to a large amount.

They further produced evidence to prove, that between the date of the contract and the 16th of *February,* 1843, *Bradley* had consumed in his furnace between 170,000 and 180,000 bushels of coal, and had made about 690 tons of iron, all of which he had sold and disposed of as his own, except said two parcels, and had actually sold a portion of it to *Payne* himself ; that several of the suits, in which the defendant *Lockwood* had attached the property, were brought for the recovery of debts contracted by *Bradley,* in his business, during that period ; and that before any possession by *Payne, Bradley* had become insolvent, and absconded from this state, and had never delivered possession of said iron to *Payne,* or had any knowledge that any possession had been taken, until long after the attachments by the defendants.

They further introduced evidence to prove, that very soon

after *Payne* had taken possession of the iron, he sent for *Lockwood*, and directed him to attach it, which he accordingly did; and that soon afterwards, and before the removal of any considerable portion of it, the attorney of the attaching creditors went to the furnace, with several writs of attachment, in favour of the defendants, *Gould, W. H. Calkins* and others, and inquired of *Lockwood*, in the presence of *Payne*, what property he had attached for *Payne*; to which *Lockwood* answered, that he had attached the iron, and all the other property of *Bradley* at the furnace; that the attorney then turned to *Payne*, and inquired if he had attached the iron; and *Payne* replied, that he had attached the whole of it; that the attorney thereupon delivered the writs to *Lockwood*, with directions to attach the iron, subject to *Payne's* attachment, which *Lockwood* accordingly did, and thereupon caused the iron to be removed, and has ever since continued to hold it, by virtue of said attachment; that after the attachments in favour of the defendants and others, by *Lockwood*, and before he had made any indorsement upon *Payne's* writ, the latter directed him to relinquish the lien acquired by his attachment, which the officer accordingly did, and made no indorsement upon *Payne's* writ, that he had attached the iron in question; and that such attachments were prior to the sale by *Payne* to the plaintiffs.

The plaintiffs denied that there was any fraud, in fact or in law, in said contract; or that *Payne* had ever attached the iron in question; or had ever so informed the defendants, or their attorney; or had been guilty of any fraudulent concealment of the contract. And as to this subject, one witness testified, that *Payne* had informed him of the existence of the contract, more than a year previous to the attachment; but all the other witnesses, who were inquired of, in relation to this subject, testified, that they had no knowledge of any such contract until the day when *Payne* attempted to take possession of the iron; and some of them, who were creditors of *Bradley*, testified, that they should not have given him credit, had they known that *Payne* held such an agreement.

But aside from the mere silence of *Payne* respecting the contract, there was no evidence of any design on his part to conceal the existence of such contract, for the purpose of enabling *Bradley* to practice any fraud upon the community,

*Litchfield,*
*June, 1844.*

Calkins
*v.*
Lockwood.

or falsely to hold himself out to the world as the owner of the property. The other matters set up by the defendants, were not controverted by the plaintiffs, except the one relative to the removal by the officer.

With respect to the question whether the iron in controversy had been attached by *Payne,* the claim on the part of the plaintiffs was, that after *Payne* had taken possession of all the iron, and had removed a few tons of it, *Richard Clark* came there, and claimed the small parcel, by virtue of a purchase from *Bradley,* and attempted to remove it, by force and violence ; and to prevent such removal, *Payne* caused that part only to be attached, and having thereby gained the peaceable possession of the iron, directed *Lockwood* to abandon his attachment.

Upon this question, there was much conflicting testimony ; and the court, for the purpose of having it determined, should it thereafter become necessary, what effect such an attachment would have upon the case, with the consent of the parties, directed the jury to find specially, whether such attachment had been made ; and they found, that the iron in question had been attached by *Payne,* in the suit in his favour, and was, by the defendant *Lockwood,* holden under such attachment, when the attachments were made by the others.

With respect to the question whether the existence of the contract had been made known, the defendants called a number of witnesses, among whom were several workmen, and the principal clerk of *Bradley,* and others, who lived near the furnace and dealt with him ; and they all, with one exception, testified, that they had no knowledge of such contract, until it was made known, on the 16th of *February,* 1843.

The plaintiffs claimed, that such contract was a valid and binding contract, as against the defendants; and that as soon as *Payne* had taken possession of the iron under it, his title became perfected, and was not destroyed, by his subsequent attachment ; that the object of the parties was, to enable him, at any time, to secure himself against his liabilities as surety for *Bradley ;* and that it could make no difference in the case, whether the iron was in existence, at the time the contract was made, or was subsequently manufactured ; that no delivery by *Bradley* was necessary; nor was it material

whether the debts for which *Payne* was liable, were, or were not, actually due, when the seizure was made.

The court instructed the jury, that upon the facts admitted by the parties, *Payne* had not acquired such a title to the iron in question, or such a lien upon it, when it was attached by the defendants, as to enable him to hold it as against them; and consequently, the verdict must be for the defendants.

The jury having returned a verdict for the defendants accordingly, the plaintiffs moved for a new trial, for a misdirection.

*Church* and *Seymour*, in support of the motion. (*a*)

*T. Smith*, (with whom was *Sterling*,) contra, contended, 1. That *Payne* had no title, under the contract of the 4th of *January*, 1842, to the iron in question, for the reason that it did not exist, at the time that contract was made. There cannot be a sale, unless the subject of it is *in rerum natura*. 2 *Kent's Com.* 504. 2 *Stark. Ev.* 608. *Mucklow* v. *Mangles*, 1 *Taun.* 318. *Groves* v. *Buck*, 3 *Mau. & Selw.* 178. *Towers* v. *Osborne*, 1 *Stra.* 506. *Clayton* v. *Andrews*, 4 *Burr.* 2101. *Rondeau* v. *Wyatt*, 2 *H. Bla.* 63. *Cooper* v. *Elston*, 7 *Term R.* 14. 16. *Crookshank* v. *Burwell*, 18 *Johns. R.* 58.

2. That this being a contract executory, or for a sale in future, no title could vest in *Payne*, until delivery by *Bradley*. *Payne*, by seizure of the property, in the absence of *Bradley*, and without his consent, could not invest himself with the title.

3. That no *sale* was contemplated, by the parties. It was a mere stipulation for a lien on property, to be hereafter manufactured, and was, therefore, nugatory. A mortgage of personal chattels conveys a present interest to the mortgagee. He takes the general property, subject to be defeated, by performance of a condition subsequent. But in this case, *Payne* was to be invested with a lien only. The general property was to remain in *Bradley*. But a lien on or a pledge of goods, not delivered, and much more, when not existing *in rerum natura*, is void. *Sto. Bail.* 197. 200. 203. 2 *Kent's Com.* 581. 634. 638. *Taintor* v. *Williams*, 7 *Conn.*

(*a*) By some accident, the reporter finds himself without any minutes of the arguments of counsel on this side of the case.

*Litchfield,*
*June, 1844.*
———————
Calkins
*v.*
Lockwood.

R. 271. *Cortelyou* v. *Lansing*, 2 *Caines' Ca. Err.* 200. *Brown* v. *Bement*, 8 *Johns. R.* 75. (2d ed.) *Barrow* v. *Paxton*, 5 *Johns. R.* 158.

4. That if *Payne* could come in and invest himself with a title, by a seizure—a proceeding *in invitum*—yet in this case, the seizure was a nullity, by reason of his attachment. There had been no effective seizure of the iron, or possession taken under the contract of the 4th of *January*, 1842, before the defendants attached. They, in the first instance, took, subject to *Payne's* attachment; and this, without notice of any claim of his, under the contract.

5. That the contract is, on the face of it, fraudulent, as to creditors. At any rate, the facts of the case, taken in connexion with the stipulations of the contract, present a clear case of fraud. *Twyne's* case, 3 *Co.* 81 *a*. *Sto. Bail.* 202. *Mason* v. *Rogers*, 1 *Root*, 324. *Patten* v. *Smith*, 5 *Conn. R.* 196. *Swift* v. *Thompson*, 9 *Conn. R.* 63. *Mills* v. *Camp*, 14 *Conn. R.* 219. *Carter* v. *Watkins*, *Id.* 241. *Osborne* v. *Tuller*, *Id.* 529.

Williams, Ch. J. The defendants claimed under attachments against one *Nathaniel E. Bradley*; and the only question finally made, was, whether the transfer of the property by *Bradley* to *Payne*, with the possession taken by *Payne* under it, which was prior to the attachments, was valid, and should prevail against the attaching creditors of *Bradley*.

The defendants claimed, in the first place, that the conveyance of the property was not valid as between the parties themselves; and secondly, that it was void as against the creditors of *Bradley*.

In support of the first proposition, it was claimed, that this property was not in existence, when *Bradley* undertook to convey it to *Payne*; *Bradley* having hired the premises of *Payne*, and *Payne* having agreed to become surety for him for the coal, which he had purchased, or might purchase, to carry on the manufacture of iron, in which he was engaged; and that the coal should be the property of *Payne*, and he should have a lien on all the iron made, or to be made, at the furnace, and all the stock and personal property that *Bradley* might have in and about the furnace, until said coal should be paid for, and said *Payne* indemnified; *Payne* to have a

right to controul and direct the sale of the iron, and apply the avails to his liabilities, and account for the balance : his lien and right to controul the property, to exist at all times.

Upon these facts the defendants claimed, that as the iron was not in existence when the contract was made, no title passed, by virtue of the contract itself; that if it was a pledge, the general property remained in the owner; that no lien could be given, except possession was also given.

It is true, that at common law, by an executed contract, no title would pass to property, in which the owner had not, what was called, an actual or potential interest; and it is said, if a man conveys all the grass upon a piece of land, cut next season, which land he shall purchase of *A. B.*, this will convey no title to the grass, even if he purchase of *A. B.*; because, at the time, he had neither an actual nor potential interest. But if he conveys all the grass which next season may grow upon lands which he then owned, this is good; because he had a potential, if not an actual, interest in such grass. *Hob.* 132. *Pow. Contr.* 152. But it does not seem necessary to examine these nice distinctions for this case. This is nothing more than an agreement, in which, for a valuable consideration, *Bradley* agrees with *Payne*, that if he will become surety for him, to aid him in carrying on the manufacture of iron, the iron shall be pledged to him to indemnify him for his guaranty, and he shall have right to take possession thereof, at his pleasure, for that purpose. In other words, he agrees with *Payne*, that if he will, by his credit, aid him to capital to carry on his manufacture, he, *Payne*, shall have the right to take, at his pleasure, the article so manufactured, and sell and apply it to the extinction of such debt.

Is there any principle of law, which, as between the parties, makes such a contract void? Among the cases cited by the defendants, no one goes this length. To create a pledge as a lien, possession may indeed be necessary; but when possession is actually taken, by virtue of a contract, it would be strange indeed to say, that the party who made that contract, could object to the possession so obtained. The case comes then to this. *Payne* has taken possession of property, by the consent of the owner, to indemnify himself for the debt of the owner, for which he was surety; and the owner would now repudiate the contract, because, at the time, he could not give

possession, the property not then being in existence. But the contract was made in contemplation of the fact, and with reference to it, and to be completed when circumstances admitted of its completion, and in fact was completed, the moment the iron was manufactured, and possession taken of it. Possession taken by *Payne*, under an agreement from *Bradley* that he might take such possession, amounts to a delivery by *Bradley*, and ought to have the same effect; and we see no more reason to say, that *Bradley* could set up this defence, than if he had sold a horse, and authorized the purchaser to go and take possession of him, in an adjoining town. In each case, something is to be done; and when that act is done, in both cases, the contract is complete. The case of *Macomber* v. *Parker*, 13 *Pick*. 175. is very analogous to this. There *H* and *L* leased to *E* a brick yard; *E* to make bricks, and pay *H* and *L* for the clay; *H* and *L* to buy the wood and sell the bricks, and to divide the profits, with power to retain the bricks in possession, to the amount of all the money they might advance to *E*. *H* and *L* assign this contract to the plaintiffs, with the assent of *E*, who was to act as his agent, and the plaintiffs to make advances, as *H* and *L* were to do. The plaintiffs took possession, and gave the charge of the yard to *E*, with directions to sell the bricks, and deposit the avails to the plaintiff's order. The bricks were afterwards attached as the property of *E*; and it was held, that the plaintiffs' lien must prevail. The court say, it was an agreement for the pledging of the bricks, as they should be made. It is true, that where the property is to be thereafter acquired, it is not strictly and technically a pledge; it is rather a hypothecation; but when the title is acquired in future, the right of the pledge attaches immediately upon it. In *Mont. on Lien*, 36. *n*. 6. it is said, that it is usual to speak of lien by contract, though that is more in the nature of an agreement for a pledge. Taken either way, however, the question always is, whether there be a right to detain the goods till a given demand shall be satisfied. He cites *Gladstone* v. *Bisby*, 2 *Mass. R.* 404. 14 *Pick*. 499. The court add, every brick, as it was formed, may well be considered as delivered to the plaintiffs, in part execution of the contract. That case differs in no respect, in principle, from the present; and, if law, must controul it.

Litchfield,
June, 1844.

Calkins
v.
Lockwood.

Judge *Story*, in his treatise on *Bailment*, (*p.* 293. *sec.* 290. 294.) cites this case with approbation; and in his text declares, that of things not in existence, there cannot be a technical pledge, at common law; yet there may be a hypothetical contract, which will attach, as a lien or pledge, to them, as soon as they come into existence; (though he says, it is not easy to reconcile this with *Bonsey* v. *Amee*, 8 *Pick.* 236.)

It is true, that the authorities in the case from *Massachusetts*, are principally from the civil law; but unless they are opposed by authority from the common law, they are not to be rejected. Judge *Story*, too, in a former edition of his treatise, seems to have entertained doubts on the subject. The citation is from the third edition. The learned Judge says, he has added new matter, as more thorough researches into foreign and domestic treatises, as well as a diligent review of the recent adjudications in *England* and *America*, have enabled him to collect, and illustrate the subject. When we recollect, that one great principle of the common law, is, to carry the contracts of parties into effect according to their intent, we do not discern why the principle laid down in the case from *Massachusetts*, is not correct, or that it depends upon any peculiarity of the civil law.

We have, therefore, no hesitation in saying, that the contract was good as between the parties.

But the great question in this case, is, whether the contract is good as against the creditors of the grantor.

It is said, the property was not in existence, when this contract was made. It is true, that the contract, on both parts, was made in relation to future events. The one was to become guarantor for the other; and the other promised to secure him therefor, by means of the very property, which was the fruit of said guaranty. We see nothing improper or unjust in this.

It is said, that possession was essential to accompany the contract, whether it was a sale or a pledge. The general principle upon this subject is not denied, as stated by the court, in *Osborne* v. *Tuller*, 14 *Conn. R.* 529. And so too it is the essence of the contract of pledge, that there should be an actual delivery; (*Sto. Bail.* 298. *sec.* 297.) though in case of an hypothecation, no such delivery is necessary. *Sto. Bail.* 300. *sec.* 297, 8. But as, in this case, possession was taken

before the attachment, it does not seem necessary to settle the question what would have been the condition of the parties, before possession was taken.

Suppose *Bradley*, to induce *Payne* to become his guarantor, had stipulated with him, to secure him, at any time, by this very property, and had done it and delivered possession; could another creditor complain, because this was done under a contract to do the same, by which no possession was given? The answer would be, until possession taken, you might have secured your debt; and if it is held, even under this contract, that possession must be taken, the same answer may be given to other creditors: possession was taken under the contract, before you made any attempt to secure yourself. The owner had given *Payne* a right to take possession. That right may not have been complete until possession taken, or delivery had; and then it seems to us, the right of *Payne* became perfect and complete; and we have seen no case among those we have examined, that contradicts this principle.

It is further said, that it is an attempt to cover all the property of the grantor. The contract does not show that. It is indeed, all the property in and about the furnace. Whether that is all, or even a large portion, of the property of the grantor, the court cannot judicially know; nor is it stated to be claimed, that this is the only property of *Bradley.* But if it was so, this was only one among other facts to be left to the jury, for them to pass upon, relative to the fraud.

Again, it is said, that the consideration is debts not then existing. On this subject, it has been often holden, in other states, that whether the engagement for which the surety was given, was a future debt, or a then existing debt, it was equally valid. *Badlam* v. *Tucker*, 1 *Pick.* 398. *Holbrook* v. *Baker*, 8 *Greenl.* 96. *DeWolf* v. *Harris*, 4 *Mass. R.* 515. *Conrad* v. *Atlantic Ins. Co.* 1 *Pet.* 448. *Sto. Bail.* 303. *sec.* 300. In *Hendricks* v. *Robinson*, Chancellor *Kent* says, nor is an assignment, if honestly made, bad, though made to secure against future as well as present responsibilities. It is altogther a question of intention; and if that be free from fraud, the assignment is not void within the statute. *Hendricks* v. *Robinson*, 2 *Johns. Ch. R.* 308. *Lyle* v. *Ducomb*, 5 *Binn.* 585. And whatever doubt may have existed

in this court, we think it has been entirely removed, by the case of *Hubbard* v. *Savage,* 7 *Conn. R.* 215. Of course, it must follow, that the fact of the debts not being due, could not affect the right of *Payne.* The contract was a contract to indemnify him against loss, by something more substantial than the mere agreement of the party. It was therefore coupled with an agreement, that he might enter and take possession of this security. Such a contract may indeed give a better opportunity to one creditor than another; but so does every contract, by which a creditor is preferred to another creditor.

It is said, that the holding this contract good, will be to destroy the salutary rule as to possession. The time and circumstances under which possession is taken, may be very proper, (as are the other objections made by the defendants, in the present case,) for the consideration of the triers, when considering whether this contract is fraudulent or not. But no one of them, nor all of them together, will authorize the court, as matter of law, to say, this contract, upon its face, is void. It is true, that contracts of this kind may be made a cover for fraud; and so of many others confessedly good. The same argument was used in the late case of *Forbes* v. *Marsh,* 14 *Conn. R.* 384. but without success. This case differs entirely from that class of cases, where the instrument itself discloses a trust for the grantor. Nothing of that kind appears upon this instrument. We think, therefore, that a new trial must be granted.

In this opinion CHURCH, STORRS and HINMAN, Js., concurred.

WAITE, J. The contract between *Bradley* and *Payne,* clearly, of itself, created no lien upon the property in question. No principle is better settled, than that a bill of sale will not operate as a conveyance of property not in existence. *Mucklow* v. *Mangles,* 1 *Taun.* 318. To perfect the sale, there must be a *delivery* of the articles specified in the bill of sale. In this case, there was no delivery by *Bradley.* He had failed and absconded, before *Payne* made any claim upon the iron.

It is not necessary to inquire, whether the instrument might

not operate as a power to sell, had *Payne* actually conveyed the iron to the plaintiffs, before the attachments of the defendants. The case shows, that the attachments were first made.

The question is then reduced to this, whether the *seizure* by *Payne*, under the contract, rendered his title valid as against these defendants. The contract does not purport to *convey* the iron, which *Bradley* should thereafter make, but merely to create *a lien* upon it, with power to sell.

Many have been the devices, which creditors have resorted to, for the security of their debts; but, so far as my researches have extended, this is the first experiment of the kind. The counsel for the plaintiffs have furnished us with no authority or precedent in support of their claim. The novelty of the instrument may well awaken suspicion that it was never before adopted, because it was supposed, that it would not prove available.

It seems to me, that the doctrine, established in *Pettibone* v. *Stevens*, 15 *Conn. R.* 19. applies, with peculiar force, to the present case. The Chief Justice, in giving the opinion of the court in that case, said, " it is not whether there was actual fraud, but whether the transaction is not one of the kind, calculated to delay, hinder or defraud creditors: and we have no hesitation in saying, that if tolerated, it would become an inlet to fraud, and lead to all imaginable abuse." *P.* 26.

Here it appears, that the existence of this contract was unknown to the community. *Bradley* was enabled to employ workmen, and purchase materials upon credit, to carry on his business—a credit, which he could never have obtained, had it been known, that there was a secret lien upon all the iron he was making.

*Payne* stood by, and suffered him to carry on his business, and dispose of the iron he made, as he pleased, without any claim or interference on his part. He even purchased a part of the iron manufactured himself. It was not until after *Bradley* had failed and absconded, that he attempted to assert any title. He then seized upon what remained.

These circumstances, in my opinion, are not merely *evidence* of fraud, but evince, that the contract is one against the policy of our laws—one which, " if tolerated, would become an inlet

to fraud, and lead to all imaginable abuse." It seems to me, that to render this contract available to *Payne*, there should have been at least a delivery to him of the iron, after it was made—that a bare seizure of any portion of the iron, at his pleasure, would not give him a valid title, as against the attaching creditors.